UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| DANA CHENG, an individual; and EPOCH GROUP INC. d/b/a EPOCH MEDIA GROUP,<br><br>          Plaintiffs,<br><br>v.<br><br>DAN NEUMANN, an individual; and MAINE PEOPLE'S ALLIANCE, a corporation, d/b/a BEACON,<br><br>          Defendants. | **COMPLAINT**<br><br>**CASE NO.:**<br><br>**DEMAND FOR JURY TRIAL** |

**COMPLAINT**

Plaintiffs DANA CHENG, an individual, and EPOCH GROUP INC. d/b/a EPOCH MEDIA GROUP (collectively "Epoch" or "Plaintiffs"), by their undersigned attorney, for their Complaint against Defendants DAN NEUMANN, an individual, and MAINE PEOPLE'S ALLIANCE dba BEACON ("Defendants" or "BEACON"), allege as follows:

**THE PARTIES**

1. At all relevant times, Plaintiff DANA CHENG is and was an individual residing in the state of New York. At all relevant times, Plaintiff EPOCH GROUP INC. d/b/a EPOCH MEDIA GROUP through its major print and online publication *The Epoch Times* is and was a New York corporation in good standing with its principal place of business in New York.

2. At all relevant times, Defendant DAN NEUMANN was and is an individual residing in state of Maine. At all relevant times, Defendant MAINE PEOPLE'S ALLIANCE, dba, BEACON, was and is incorporated in the state of Maine as a non-profit corporation with its principal place of business in Portland, Maine.

**PERSONAL JURISDICTION AND VENUE**

3. Federal Rule of Civil Procedure 4 directs every federal district court to follow the law on personal jurisdiction that is in force in the state courts where the federal court is located. Personal jurisdiction is proper under Maine state law because Defendants are located in this judicial district.

4. Venue is proper because Defendant's principal place of business is in this judicial district.

**SUBJECT MATTER JURISDICTION**

5. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, which gives federal courts original jurisdiction over civil actions where the matter in controversy exceeds $75,000 and is between citizens of different states.

6. Plaintiff is a citizen of New York and Defendants are citizens of Maine. Further, Plaintiff's damages exceed $75,000.

**FACTUAL BACKGROUND**

7. Over the last year, in an unrelenting series of episodes, people of Asian descent have been pushed, beaten, kicked, spit on and called slurs. Homes and businesses have been vandalized. The violence has known no boundaries, spanning generations, income brackets and regions.

8. In New York City alone, the number of hate crimes with Asian-American victims reported to the New York Police Department jumped to 28 last year, up from three in 2019. So far this year, the department is actively investigating or has solved 35 anti-Asian bias crimes.

9. In this racially charged environment, on June 16, 2021, Defendant Maine People's Alliance through its dba and chief publication, *Beacon*, published an online article using the clickbait title: "Maine GOP hosts speaker present at Jan. 6 Capitol Assault." A copy of the

article is attached as **Exhibit A** (the "Article"). Immediately above the headline was a photograph of Plaintiff Dana Cheng, an Asian female, whom the Article falsely described as a full, enthusiastic, and partisan participant in the violence of January 6, 2021. Dr. Cheng is actually a credentialed journalist employed by Plaintiff *The Epoch Times*.

10.   *Beacon,* and its readers, are to the extreme political left. In a 2016 article, President of the Maine Senate, Michael Thibodeau, described Maine People's Alliance as a "controversial activist group" and "a well-organized and well-financed group that has a history of launching unfounded, vicious attacks on their political opponents." *See The Maine Wire*, accessible at https://www.themainewire.com/2014/05/maine-democrats-seeks-distance-disturbing-maine-peoples-alliance/.

11.   Consistent with this description, the obvious intention of the Article was, at least in part, to smear the Maine GOP by suggesting to readers, through its eye-catching (but false) headline that the Maine GOP hosted a speaker who participated in the Capitol violence on January 6, 2021.

12.   With this headline, the accompanying photo, and the paragraphs that followed, Defendant Neumann and *Beacon* put Dr. Cheng's life in peril by painting her as a violent Asian propagandist.

13.   Knowing of the growing violence against Asians in the United States, the Defendants provided its core extremist readership with Dr. Cheng's name, photograph, and her business information. In fact, Defendants inserted Dr. Cheng's full facial photograph as the lead visual feature of the Article directly above the heading precisely so that its readers would link her to the Capitol violence as a full participant. Rather than countering or clarifying this false impression, the Article then devotes multiple paragraphs to further enhance the false impression Defendants set out to create, which was to intentionally lead readers to believe that Dr. Cheng

was a full participant in the Capitol violence.

14. Armed with this information and incited by the deliberately incendiary Article, an extremist reader could easily show up at Dr. Cheng's place of business by searching for the business address of *The Epoch Times*, identify her by her name and photo, and potentially cause her harm for the simple fact that she is an Asian-American that Defendants falsely portrayed as a member of the attack on the Capitol.  Furthermore, the audience for this message is wider than just *Beacon*'s local readership.  The Article appears in Google and other search engines, including as a first result depending on terms used, increasing the risk that Dr. Cheng will be mistakenly viewed as violent and a worthy target for violent revenge.

15. The photograph and the headline require no interpretation to be viewed as a dangerous incitement:



(Source:  Maine Beacon, accessible at https://mainebeacon.com/maine-gop-hosts-speaker-present-at-jan-6-capitol-assault/, accessed June 23, 2021.)

16. To make matters worse, the Article falsely identified Dr. Cheng as:

4813-5481-7008.1                                              3

- "a far-right media personality";

- "conspiracy theorist";

- someone who was "among the supporters of former President Donald Trump . . . at the riot at the U.S. Capitol on Jan. 6.".

17.     The Article also falsely states that "Cheng alleged during [a] radio interview that the violence that day [at the Capitol on January 6th] was perpetrated by anti-fascist infiltrators."

18.     Cheng is not a far-right media personality.  Cheng is the Vice-President of *The Epoch Times*.  In that role, she focuses on the day-to-day operations of the publication.  She works behind the camera; not in front of it.  Far from being a "media personality," Dr. Cheng is a very private person and is mostly unknown to the public.  In addition, none of Dr. Cheng's views expressed in the radio interview or anywhere else in the Article can be described as "far right."  In classifying Dr. Cheng as a "far right" extremist that was sympathetic to violence at the Capitol on January 6th, and a participant in it, the Article disregarded a radio interview that was so accessible that it had even been linked in the Article.  Defendants almost certainly did not listen to it, or if they did, they disregarded it.

19.     In the interview, Dr. Cheng takes the traditional Liberal position that totalitarianism must be opposed, stating that traditional American civic values are a counterpoint to despotism.  Dr. Cheng summarized her role as journalist at the Capitol on January 6, and offered an assessment that cautioned against drawing conclusions since further investigation was pending, stating, though, that tactically the events that day seemed influenced by multiple chaotic forces.  Dr. Cheng qualified herself to speak by summoning her own past as a political refugee bound for America, fleeing violence and persecution of both herself and her family.

20.     None of this made its way in the Article.  Instead, Defendant Neumann and *Beacon* zeroed in on the Capitol riot, identified Dr. Cheng as a full and enthusiastic participant, then mocked Dr. Cheng as engaging in "rhetoric reminiscent of the Red Scare…."   (A true and

correct copy of a transcription of the interview is attached as **Exhibit B**, and incorporated by reference.)

21. Dr. Cheng agreed to speak about events she observed as a spectator (not a participant) at the Capitol on January 6, 2021, in the podcast/radio interview that had limited distribution. Underscoring the deliberateness of the Article's falsehoods, the headline as clickbait, and Dr. Cheng's photograph as an incitement is the entirely contradictory and truthful information Dr. Cheng herself provided in the linked podcast. Defendants, having it within their direct power to access accurate information and write a truthful account (or at least avoid outrageous falsehoods), elected instead to embrace and promote an entirely false account. Indeed, in their clickbait headline, Defendants *discarded* the podcast host's original headline and created an entirely new one that advanced their defamation.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

22. Defendants discarded this:



(Source: "The Kim Monson Show," accessible at

https://kimmonson.com/kim_monson_show/an-eye-witness-to-the-protest-at-the-capitol/,

accessed June 23, 2021)

23. And replaced it with this:



(Source: Maine Beacon, *supra*, accessible at https://mainebeacon.com/maine-gop-hosts-speaker-

present-at-jan-6-capitol-assault/, accessed June 23, 2021.)

24. The podcast, as linked in the Article, has since been removed from the destination website. While it remains in place at the podcast host Kim Monson's website, the Monson website itself is not referred to in the Article.

25. Dr. Cheng is not a conspiracy theorist, much less the "Red scare" McCarthyite the Article falsely portrays. Dr. Cheng and *The Epoch Times* advocate against Marxist totalitarianism. Dr. Cheng did indeed state in her radio interview that foreign Marxist influences have invaded American academia and even the private sector, affecting the security and international competitiveness of the United States and its allies. Contrary to the Article's concoction that these are Dr. Cheng's crackpot conspiracy theories, they are not conspiracy theories – they are facts. There have been multiple arrests with trials pending. The Federal Bureau of Investigation has even dedicated a portion of its website to elevating public awareness of the threat of pernicious foreign influence. *See* "The China Threat," available at https://www.fbi.gov/investigate/counterintelligence/the-china-threat, accessed June 20, 2021; *see also* "FBI opens a new investigation into China 'every 10 hours,' bureau director says," available at https://www.cnn.com/2021/04/14/politics/fbi-director-china-investigations-intl-hnk/index.html, accessed June 20, 2021. Despite the overwhelming availability of truthful and accurate information about these threats that *corroborate* Dr. Cheng, Defendant Neumann's *Beacon* article identified Dr. Cheng as a violent, lying conspiracy theorist.

26. Also contrary to the Article, while Dr. Cheng was in fact in Washington, D.C, on January 6, 2021, she was not "among the supporters of former President Donald Trump" that day. Dr. Cheng was at *The Epoch Times* office in Washington, D.C, for most of the day (near the Capitol) and visited the Capitol to check on her reporters and camera crew. Instead of reporting this (or saying nothing at all about this being Dr. Cheng's purpose), Defendant

Neumann and *Beacon* created out of whole cloth the narrative that she was present as a participant in the Capitol violence, as a fervent Trump partisan bent on violence and civic disruption. To seal the association as grisly and perverse for *Beacon*'s readers, Neumann wrote in the Article that there were five fatalities at the scene.

27. Furthermore, contrary to the Article, the radio interview linked to the Article makes clear that Dr. Cheng did not allege that the violence at the Capitol on January 6th was "perpetrated by anti-fascist infiltrators". Quite the opposite, Dr. Cheng merely stated that certain people that submitted information to *The Epoch Times* made such claims and that the information had not been verified. (*See* transcript, *supra*, attached as **Exhibit B**, p. 1).

28. The Article then goes on to falsely characterize the newspaper that Cheng co-founded, *The Epoch Times*, in making the following statements:

- *The Epoch Times* is a "right-wing" newspaper and media company;
- *The Epoch Times* "is partially funded by far-right media financier Robert Mercer";
- *The Epoch Times* has promoted anti-vaccine misinformation; and
- *The Epoch Times* has "promoted conspiracy theories such as QAnon."

29. *The Epoch Times* is not a "right-wing" newspaper. *The Epoch Times* is a non-partisan publication with a mission of bringing readers a truthful view of the world free from the influence of any government, corporation, or political party.

30. *The Epoch Times* is not funded by Robert Mercer. This false statement was obviously intended to make *Beacon* readers falsely believe that *The Epoch Times'* reporting is influenced by "far-right" donors. It is not.

31. *The Epoch Times* has never *promoted* anti-vaccine *misinformation*. *The Epoch Times* has truthfully reported on news about the COVID-19 vaccine.

32. Similarly, *The Epoch Times* reported on QAnon but never promoted the

organization or its theories.

33. With the truth a click away, Defendant Neumann and *Beacon* chose falsehood. They demonstrated a reckless attraction to fabrication since their fabrications suited their ideology. For Defendant Neumann and *Beacon*, ideology is their lens, not accuracy. In doing it on this occasion, in this Article, to Dr. Cheng an Asian female, they did what they set out to do, complete with a photograph of their target: they stripped Dr. Cheng of her personal integrity, her professional integrity, her professionalism, her gravitas, and her sense of personal safety, by falsely classifying her as a violence-prone liar, employed by an international purveyor of them, organizing all of this into an incitement designed to produce reader outrage against Dr. Cheng. Providing Dr. Cheng's photograph was a direct intimidation. Defendant Neumann and *Beacon* meant to mark her as an enemy of their readers, which in the current milieu of anti-Asian violence is a dangerously misguided taunt.

34. Defendants intended to piece together multiple disjointed "facts" to create a false alternative universe and an incendiary false narrative: Asian female Cheng is a hyper-partisan aligned with multiple sinister forces, from "white supremacists" to violent rioters, and she participated enthusiastically with these violent rioters as she herself marched on the Capitol, where rioters not only stormed the building but left five dead. The only mitigation Defendant Neumann and *Beacon* offered was to mention that Dr. Cheng was not in front of the mob as the Capitol was breached.

35. Dr. Cheng now has every reason to be terrified that she's been tagged by extremists and targeted for retribution based on falsehoods the Article presents as facts. According to the Article, she was not a bystander observing violent events on January 6th, she was a partisan participating in the violence. Defendant Neumann and *Beacon* meant to concoct a false picture and succeeded. This is a gross violation of even *Beacon*'s own self-promotion. On

its website, it promotes its own "fairness," "rigorous reporting," "shar[ing] information," and "smart, progressive voices," phrasing that specifically seeks to present its website as reporting facts, not opinion.  (*See* "Maine Beacon," accessible at https://mainebeacon.com/about/, accessed June 28, 2021.)

36.  The following causes of action result.

## FIRST CAUSE OF ACTION

### (Defamation, by Plaintiff Cheng against both Defendants)

37.  The previous paragraphs are incorporated by reference as if fully incorporated herein.

38.  Defendants published the Article online, where readers reasonably understood that the Article was about Plaintiff Dr. Cheng.

39.  The Article as to Dr. Cheng was false.

40.  The Article's false statements were known by Defendants to be false, yet they nevertheless published the Article.  Defendants therefore acted with malice.

41.  Defendants' conduct was not privileged.

42.  Dr. Cheng has been harmed in her personal and professional reputation by Defendants' mischaracterization of Dr. Cheng as a violence-prone conspiracy theorist who participated in a partisan riot that resulted in five deaths.  Dr. Cheng is a professional journalist. Associating Dr. Cheng with violence, partisanship, and rioting is defamatory per se.

43.  Defendant's wrongful conduct was a substantial factor in causing Plaintiff Dr. Cheng's harm.

44.  **SECOND CAUSE OF ACTION**

### (Defamation, by Plaintiff The Epoch Times against both Defendants)

45.  The previous paragraphs are incorporated by reference as if fully incorporated

herein.

46.     Defendants published the Article online, where readers reasonably understood that the Article was referring to *The Epoch Times*.

47.     The Article as to *The Epoch Times* was false.

48.     Defendants knew the Article as to The Epoch Times was false or had serious doubts about the truth of the Article, yet nonetheless published it.  Furthermore, in making such sweeping yet precise comments while on actual notice that the information being presented as factual was actually incorrect and false, Defendants' wrongful conduct was done with malice.

49.     Defendants' conduct was not privileged.

50.     Defendant's wrongful conduct has caused harm to *The Epoch Times* business and reputation.  *The Epoch Times* presents itself as a reliable and viable provider of accurate and trustworthy information, with a commitment to journalistic integrity, particularly given that one of its foundational commitments is to provide news and information in opposition to despotism and totalitarianism.  Defendants deliberately set out to present a narrative that was totally at odds with *The Epoch Times'* reputation for accuracy and dependability.  Attributing dishonesty to *The Epoch Times* completely undercuts its business model and its business purpose, and is defamatory per se.

51.     Defendants' wrongful conduct has caused harm to *The Epoch Times'* business and reputation.

52.     Defendants' wrongful conduct was a substantial factor in causing Plaintiff's harm.

## THIRD CAUSE OF ACTION

### (False Light Invasion of Privacy, by Plaintiff Cheng against both Defendants)

53.     The previous paragraphs are incorporated by reference as if fully incorporated herein.

54. Defendants' Article falsely painted private citizen and professional journalist Dr. Cheng as a dangerous extremist with ties to white supremacists, as having enthusiastically participated in the Capitol breach on January 6, and doing so as a partisan of then-President Trump.

55. The Article juxtaposed a photograph of Plaintiff alongside these falsehoods specifically in order to drive home the Article's false narrative about her association with and support for violence.

56. The Article had as its goal to characterize Dr. Cheng as dangerous and violent, when in fact Dr. Cheng is a professional and journalist, condemns political violence, and is actually a refugee from it.

57. Defendants' conduct was not privileged.

58. Defendants' wrongful conduct was a substantial factor in causing Plaintiff's harm.

## FOURTH CAUSE OF ACTION

**(Intentional Infliction of Emotional Distress, by Plaintiff Cheng against both Defendants)**

59. The previous paragraphs are incorporated by reference as if fully incorporated herein.

60. Defendants' conduct in presenting the Article's falsehoods about Dr. Cheng intended to incite others to view her with contempt. Defendants knowingly heightened their attack by posting her photo along with the Article, as if to invite attack.

61. At a time of acute awareness of anti-Asian violence, Defendants falsely painted Dr. Cheng, an Asian female, as a violent extremist, provided her photo and identified her employer, all to ensure that all who read what they wrote would know exactly what she looked like and where to find her.

62. This represented a calculation by Defendants that they could intimidate Dr. Cheng

into future silence by threatening her with implied violence at the hands of any reader who may be incited by Defendants' falsehoods.  Defendants did this knowing that anti-Asian violence had become a national crisis.

63. Defendants' intimidation of Dr. Cheng was extreme and outrageous, particularly for a self-described news source.

64. Defendants' conduct has caused Dr. Cheng extreme emotional distress, a reasonable reaction for a targeted Asian woman who now must fear attack by those misled by Defendants' outrageous falsehoods.

## FIFTH CAUSE OF ACTION

### (Negligent Infliction of Emotional Distress, by Plaintiff Cheng against both Defendants)

65. The previous paragraphs are incorporated by reference as if fully incorporated herein.

66. In the alternative, Defendants' conduct in presenting the Article's falsehoods about Dr. Cheng negligently disregarded the consequences of their actions.  Even if they did not act to intentionally distress Dr. Cheng, Defendants negligently disregarded the reasonable likelihood of her distress.

67. Defendants' neglect in inflicting emotional distress on Dr. Cheng violated their duty to recognize and assess the reasonable and probable consequences of their actions.

68. A reasonable person in the position of Defendants would have recognized that falsely charging a female Asian with violence against the American government could have a catastrophic outcome by escalating the likelihood of revenge violence against her, particularly when accompanied by a photograph and the name of her employer (and therefore location).

69. Defendants' duty was heightened by their awareness as news-gatherers that words have consequences and the internet is a powerful took.

70. Defendants' conduct has caused Dr. Cheng extreme emotional distress, a reasonable reaction for a targeted Asian woman under the totality of these circumstances.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs DANA CHENG and EPOCH GROUP INC. d/b/a EPOCH MEDIA GROUP respectfully demand judgment in its favor and against Defendants DAN NEUMANN, and MAINE PEOPLE'S ALLIANCE dba BEACON:

1. For an injunction enjoining Defendants from further publication of any false, malicious, defamatory or materially misleading comments regarding Plaintiff;

2. For an award of money damages in accordance with the evidence, together with interest thereon for damage to Plaintiff's business reputation;

3. For an award of punitive damages sufficient to punish and deter the conduct complained of herein;

4. For attorneys' fees and costs of suit herein;

5. For a retraction of the Article in any medium it was published; and

6. For such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiffs DANA CHENG, an individual, and EPOCH GROUP INC. d/b/a EPOCH MEDIA GROUP demand a trial by jury on all issues.

Dated: June 30, 2021

*Kip J. Adams*
_____
Kip J. Adams, Maine Bar No. 004546
Kip.Adams@lewisbrisbois.com
LEWIS BRISBOIS BISGAARD &
SMITH LLP
One International Place, Suite 350
Boston, Massachusetts 02110
857.313.3950

Christopher J. Bakes (*pro hac vice pending*)
Christopher.Bakes@lewisbrisbois.com
LEWIS BRISBOIS BISGAARD &
SMITH LLP
2020 West El Camino Avenue, Suite 700
Sacramento, California 95833
916.564.5400

Bryan P. Sugar (*pro hac vice pending*)
Bryan.Sugar@lewisbrisbois.com
LEWIS BRISBOIS BISGAARD &
SMITH LLP
550 West Adams Street, Suite 300
Chicago, Illinois 60661
312.345.1718

*Attorneys for Plaintiffs DANA CHENG and
    EPOCH GROUP INC. d/b/a EPOCH
    MEDIA GROUP*