UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| DANA CHENG and<br>EPOCH GROUP, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>DAN NEUMANN and<br>MAINE PEOPLE'S ALLIANCE,<br><br>Defendants. | ) | No. 2:21-cv-00181-LEW |

**ORDER ON DEFENDANTS' MOTION TO DISMISS**

Plaintiffs Dana Cheng and the Epoch Group seek to hold liable Defendants Maine People's Alliance and Dan Neumann, a journalist for the *Beacon*, based on statements found in the *Beacon*'s June 16, 2021 article, "Maine GOP hosts speaker present at Jan. 6 Capitol assault." The matter is before the court on Defendants' motion to dismiss Plaintiffs' complaint for failure to assert something other than a "strategic lawsuit against public participation," sometimes referred to as a "SLAPP suit." Defendants' Motion to Dismiss (ECF No. 12). For reasons that follow, I grant Defendants' motion.

**BACKGROUND**

Plaintiff Epoch Group, Inc. ("Epoch Group") is a New York corporation that publishes the online newspaper the *Epoch Times*. Plaintiff Dana Cheng is a New York resident. She is also an officer of Epoch Group and a founder of the *Epoch Times*.

Defendant Maine People's Alliance is a Maine corporation and publishes the online media outlet the *Beacon*. Defendant Dan Neumann is a Maine resident who writes for the *Beacon*.

On June 16, 2021, the *Beacon* published an article written by Neumann and titled "Maine GOP hosts speaker present at Jan. 6 Capitol Assault" (the "Article"). The Article described how the Maine Republican Party, Gray Republican Town Committee, and Christian Civic League hosted an event in Maine that featured a livestream address by Cheng. The Article featured Cheng's image at the top of the page and identified Cheng in the opening paragraph as "a far-right media personality and conspiracy theorist who has said she was among the supporters of former President Donald Trump who were present at the riot at the U.S. Capitol on Jan. 6." The Article identified the *Epoch Times* as a "right-wing multi-language newspaper and media company."

In support of these opprobrious epithets the Article went on to quote or paraphrase some of Cheng's remarks made during her livestream with the Grey Republicans and during a recent radio interview aired on Denver radio station KLZ 560 AM and presently available by podcast at the Kim Monson Show. Concerning the latter, the Article reported that Cheng stated that the January 6 violence was perpetrated by the "antifa movement" rather than by supporters of President Donald Trump.

Concerning the *Epoch Times*, Defendants described its media content as including articles questioning the results of the 2020 election, promoting anti-vaccine misinformation, and promoting the QAnon conspiracy theory. Defendants reported that the *New York Times* has described the *Epoch Times* a "global-scale misinformation machine." They also characterized and quoted some of Cheng's remarks to the Grey Republicans.

Defendants first characterized Cheng's remarks as "reminiscent of the Red Scare" because Cheng alleges that communist plotters influence "the highest ranks of U.S. government, academia and media." Defendants then quoted Cheng's remark that "some *New York Times* reporters used to work for Chinese Communist Party media," and that "mainstream media" is "greatly influenced by communist propaganda."

Defendants also reported that the *Epoch Times* "is partially funded by far-right media financier Robert Mercer." However, after publication, the *Beacon* issued a correction stating that one of Mercer's employees, not Mercer himself, had contributed to the *Epoch Times*.

## DISCUSSION

Cheng and Epoch Group allege defamation, while Cheng further alleges false light invasion of privacy and both negligent and intentional infliction of emotional distress. Cheng alleges that the Article's characterizations of her as a "far-right media personality" and "conspiracy theorist" present "at the riot at the U.S. Capitol" were false and defamatory, and that the Article falsely characterized statements Cheng made during her radio-podcast appearance with Kim Monson. Compl. ¶¶ 16–17 (ECF No. 1). Cheng further alleges that the Article's statements and its identification of Cheng both in name and in image have exposed Cheng to a risk of violence and have caused her reasonably to fear for her safety. *Id.* ¶¶ 33–35. For its part, Epoch Group[1] alleges that the Article's characterization of the *Epoch Times* as a "far-right" newspaper that was funded by Robert

[1] In the complaint, Plaintiffs say the Article's affronts toward the *Epoch Times* were felt especially by Cheng. Compl. ¶ 28 ("The Article then goes on to falsely characterize the newspaper that Cheng co-founded …."). Presumably, it is Epoch Group that serves as the plaintiff for a claim concerning the *Epoch Times*.

Mercer and promoted misinformation about vaccines, QAnon, and the 2020 election was false and defamatory. *Id.* ¶ 28.

Through their Motion to Dismiss, Defendants argue that they are entitled to an order dismissing the case because the Article's contents are true or matters of opinion and, therefore, are protected under the First Amendment, and that this action is a "SLAPP" suit that must be dismissed under either New York or Maine anti-SLAPP laws. Defendants also argue that Dana Cheng's other claims for relief are not recognized under New York law. My discussion begins with choice-of-law concerns.

**A. Choice of Law**

Before addressing the merits of Defendants' motion, I must determine what body of law governs. This is a two-step inquiry, under which I first evaluate whether federal law or state law supplies the appropriate rule of decision. *In re Volkswagen & Audi Warranty Extension Litig.*, 692 F.3d 4, 14 (1st Cir. 2012). If the matter is to be determined by state law, I must then decide which state's law to apply. *Id.*

By way of background, the Federal Rules of Civil Procedure allow a defendant to file a motion to dismiss all or part of a complaint for failure to state a claim for which relief may be granted. Fed. R. Civ. P. 12(b)(6). In a proceeding on such a motion, a court limits its review to the facts found within the four corners of the complaint, any facts found in documents attached to the complaint or essential to the complaint's allegations, and other materials if they are susceptible to judicial notice. *Zenon v. Guzman*, 924 F.3d 611, 615-16 (1st Cir. 2019). Under the federal rules, the dismissal of a complaint based on a legal defense to the claims asserted in the complaint (for example, Defendants' First Amendment

defense) is only appropriate if a review of the complaint, the attached materials, and noticeable extraneous materials makes it clear beyond doubt that the asserted claims succumb to the defense. *Id.* at 616. However, both Maine and New York have enacted laws designed to provide enhanced protection for the exercise of First Amendment rights against the chilling effects of litigation based on state tort law. This enhanced protection takes the form of a motion to dismiss in which the record and the party's respective burdens are augmented to allow the court to determine, at the inception of the litigation, whether a given tort claim is designed to chill the defendant's exercise of free speech rights.

Maine's anti-SLAPP law authorizes a defendant sued for exercising his "right of petition" to bring a "special motion to dismiss," which motion "shall" be granted unless the non-moving party can show that the case has an adequate basis in law. 14 M.R.S. § 556. Maine law instructs a court to "consider the pleading and supporting and opposing affidavits stating the facts upon which the liability or defense is based." *Id.* The law further deters speech-chilling litigation by enabling a defendant who prevails on a special motion to dismiss to recover litigation costs and attorney's fees from the plaintiff. *Id.* New York's anti-SLAPP law is spread across three different statutes and creates similar protections for First Amendment activities. *See* N.Y. Civ. Rights Law § 76-a (McKinney) (forbidding interference with right to public participation); N.Y. C.P.L.R. 3211(g) (McKinney) (establishing pleading standard, allocation of burdens, and procedures for motions to dismiss and for summary judgment in SLAPP cases); N.Y. Civ. Rights Law § 70-a (McKinney) (SLAPP defendants may recover attorney's fees). Like Maine law, New York

law calls upon a court to conduct a more searching review of the merits at the motion to dismiss stage.

**1. Federal or state law**

Under the rule of *Erie Railroad Company v. Tompkins*, 304 U.S. 64 (1938), a federal court sitting in diversity looks to state law on substantive issues and federal law on procedural issues. *Godin v. Schencks*, 629 F.3d 79, 85 (1st Cir. 2010). When a state law governing procedure conflicts with a federal rule, the federal rule generally must obtain in federal court. *Id.* at 86. However, the line between substance and procedure proves much cleaner in theory than in practice, and courts generally have adopted an analysis that looks more functionalist than formalist. In the First Circuit, an ostensibly procedural state rule will obtain in federal court where, for example, no federal procedural rule addresses the same subject, *id.* at 88, or where the state rule is "so intertwined with a state right or remedy that it functions to define the scope of the state-created right," *id.* at 87 (quoting *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 423 (2010) (Stevens, J., concurring)).

Defendants have moved to dismiss both for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) and for interference with the right to public participation under the New York or Maine anti-SLAPP laws. The former challenge presents no *Erie* issue: Rule 12(b)(6) supplies plainly federal procedural rules, and state law governs the substantive aspects of Plaintiffs' claims and Defendants' motion. The latter, however, asks this court to address a special type of motion created under state law. Consequently, I must determine whether such motions to dismiss, "though procedural in form, serve[] the

function of defining" the scope of any right guaranteed by the respective state. *Shady Grove*, 559 U.S. at 432 (Stevens, J., concurring).

To the extent that Defendants raise a special motion to dismiss under Maine's anti-SLAPP law, *see* 14 M.R.S. § 556, *Erie* does not bar them from doing so. The First Circuit has held that Maine's anti-SLAPP law is substantive for *Erie* purposes, and so applies in federal court. *See Godin*, 629 F.3d at 91. The court noted, first, that the anti-SLAPP law "serve[d] the entirely distinct function of protecting those specific defendants that have been targeted with litigation on the basis of their protected speech," a function the federal dismissal and summary judgment procedures do not serve. *Id.* at 89. Thus, Maine law complements, rather than conflicts with, the dismissal and summary judgment procedures in the Federal Rules of Civil Procedure. *Id.* at 86. The court further determined that, unlike the relevant Federal Rules of Civil Procedure, the anti-SLAPP law had "both substantive and procedural aspects." *Id*. at 89. Among the elements of the law that the court recognized as substantive are the law's "allocation of the burden of proof" to the non-movant on special motions, the pleading standard for surviving such motions, and the fact that the law ultimately "alters what plaintiffs must prove to prevail." *Id.* The most obviously procedural aspect of the law is that it expands "the record on which the motion is evaluated" as compared to a motion to dismiss under Rule 12(b)(6). *Id.* at 90. But because the procedural elements of the anti-SLAPP law were "intertwined with" the right or remedy created by the law; the court treated the entire law as substantive. *Id.* at 89 (quoting *Shady Grove*, 559 U.S. at 432 (Stevens, J., concurring)). Finally, the court noted that refusing to apply Maine's anti-SLAPP law in federal court would deprive federal court defendants of the

protections of a higher substantive standard and spare federal court plaintiffs the threat of paying a defendant's attorney's fees, thereby leading to the unequal administration of justice and incentivizing plaintiffs to choose federal over state court. *Id.* at 93.

To the extent that Defendants move to dismiss under New York's anti-SLAPP law, *Godin* also makes clear that, for purposes of litigation filed in the district courts within the First Circuit, New York's law is substantive and therefore applicable in federal court.[2] New York's scattered anti-SLAPP statutes, like Maine's more concise anti-SLAPP statute, contain both substantive and procedural elements. Among the statutes' substantive aspects are provisions establishing the standard that a defamation plaintiff must prove, *see* N.Y. Civ. Rights Law § 76-a(2), and allocating the burden of proof to the non-movant on anti-SLAPP motions and defining the pleading standard for surviving such motions, *see* N.Y. C.P.L.R. 3211(g)(1). *See also Godin*, 629 F.3d at 85 n.3, 89 (recognizing these rights as substantive). And, as with the Maine anti-SLAPP law, the substantive and procedural provisions of the New York anti-SLAPP law are intertwined such that the vindication of the former depends upon the availability of the latter. Like the Maine anti-SLAPP statute, these New York statutes cohere to ensure the speedy disposition of cases involving constitutionally protected public participation, thus are substantive for *Erie* purposes.

[2] Federal district courts sitting in New York have disagreed as to whether New York's anti-SLAPP laws apply in federal court. *Compare Palin v. New York Times Co.*, 510 F. Supp. 3d 21, 27 (S.D.N.Y. 2020) (applying anti-SLAPP standard for liability) *with Nat'l Acad. of Television Arts & Scis., Inc. v. Multimedia Sys. Design, Inc.*, No. 20-CV-7269-VEC, 2021 WL 3271829, at *13 (S.D.N.Y. July 30, 2021) (declining, under *Erie* doctrine, to apply anti-SLAPP law). *See also Ctr. for Med. Progress v. Planned Parenthood Fed'n of Am.*, No. 20-CV-7670-CM, 2021 WL 3173804, at *10 (S.D.N.Y. July 27, 2021) (treating applicability of anti-SLAPP law in federal court as an open question). But I need not tarry on such disagreement among out-of-circuit authorities where, as here, First Circuit precedent squarely resolves the issue.

Accordingly, Defendants may move to dismiss based on state anti-SLAPP law, and I must rule on Defendants' motion as a state court would.

**2. Maine or New York law**

The parties disagree over whether this case should be resolved under Maine law or New York law. Before I choose, I consider "whether an actual conflict exists between the substantive laws of the interested jurisdictions." *Reicher v. Berkshire Life Ins. Co. of Am.*, 360 F.3d 1, 4 (1st Cir. 2004). If "the resolution of a choice-of-law determination would not alter the disposition of a legal question, a reviewing court need not decide which body of law controls." *Okmyansky v. Herbalife Int'l of Am., Inc.*, 415 F.3d 154, 158 (1st Cir. 2005). Here, neither party suggests that Maine law and New York law are materially different with respect to the elements of Plaintiffs' tort claims; instead, Plaintiffs argue that Maine law and New York law conflict insofar as Defendants may properly raise an anti-SLAPP defense under the latter but may not do so under the former.

Though the Maine and New York anti-SLAPP laws are largely similar in their substantive and procedural aspects, the laws may differ in scope. New York law protects "public petition and participation." N.Y. C.P.L.R. 3211(g), which extends to newspapers and other media publications. *See*, *e.g.,*, *Reus v. ETC Hous. Corp.*, 148 N.Y.S.3d 663, 669 (Sup. Ct. 2021) (granting anti-SLAPP defense by newspaper). Thus, the Article, and by extension this case, certainly fall within the scope of New York's anti-SLAPP law. Whether Maine's anti-SLAPP law applies is a thornier question. Maine law protects the "right of petition." 14 M.R.S. § 556. The Law Court has held that this protection is applicable to newspaper articles if "those articles constitute the newspaper petitioning on

its own behalf," *Gaudette v. Mainely Media, LLC*, 2017 ME 87, ¶ 17, 160 A.3d 539, 543, but has expressly declined to delineate "when news reporting or editorializing might constitute petitioning activity," *id.* ¶ 18 n.3. Because *Gaudette* leaves open the possibility that New York law is more protective of Defendants than Maine law, I will assume that there is a conflict requiring me to choose between New York and Maine law.

A federal court exercising diversity jurisdiction applies the choice-of-law rules of the state in which it sits. *Foisie v. Worcester Polytechnic Inst.*, 967 F.3d 27, 41 (1st Cir. 2020). Maine follows the approach of the Second Restatement of Conflict of Laws, under which a tort action generally will be decided under "the local law of the state where the injury occurred . . . unless, with respect to the particular issue, some other state has a more significant relationship . . . to the occurrence and the parties." *State Farm Mut. Auto. Ins. Co. v. Koshy*, 2010 ME 44, ¶ 22, 995 A.2d 651 (quoting Restatement (Second) Conflict of Laws § 146).

The Second Restatement recognizes special choice of law principles for "multistate defamation" and "multistate invasion of privacy," or cases in which the allegedly tortious content is distributed via "aggregate communication" available in multiple states. Restatement (Second) Conflict of Laws §§ 150(a), 153 ("Restatement"). Here, the allegedly defamatory or invasive material was published on the internet. Sections 150 and 153 provide that such cases will be determined under the law of the state with "the most significant relationship to the occurrence and the parties under" the Restatement's general choice-of-law principles. *Id.* § 150(a) (citing § 6); *accord* § 153. They further establish a presumption that the governing law will "usually" be the law of "the state where the

[alleged victim] was domiciled"—or, in the case of corporate victims, where the corporation had its "principle place of business"—so long as "the matter complained of was published in that state." *Id.* § 150(b)–(c); *accord* § 153.

Under Restatement sections 150 and 153, New York law applies to this dispute. Because the allegedly defamatory or invasive material was published on the internet, the choice of law provisions for multistate torts apply. *See Fuqua Homes, Inc. v. Beattie*, 388 F.3d 618, 622 (8th Cir. 2004) (section 150 applied to allegedly defamatory online publication). Cheng is, and at all relevant times has been, domiciled in New York; likewise, Epoch Group maintains its principle place of business in New York. The Article also was published in New York, insofar as it was posted to the internet and so effectively published "in" every state. *See, e.g.*, *Ayyadurai v. Floor64, Inc.*, 270 F. Supp. 3d 343, 354 (D. Mass. 2017) (finding that "website, which [was] accessible by anyone anywhere with an Internet connection, was published in Massachusetts"); *Mzamane v. Winfrey*, 693 F. Supp. 2d 442, 471 (E.D. Pa. 2010) (allegedly defamatory statements "were available on the internet, and therefore, were published throughout the United States, including Pennsylvania"). Where allegedly defamatory material is disseminated via the internet, "the most important consideration in choosing the applicable law is the residence of the party allegedly defamed." *Aoki v. Benihana, Inc.*, 839 F. Supp. 2d 759, 765 (D. Del. 2012). In this case, that state is New York.

Even looking past this presumption, New York has the greatest interest in Plaintiffs' case under the Restatement's general choice-of-law principles. *See* Restatement § 150(a) (citing § 6). Among the most salient factors to be considered are "the relevant policies of

the forum, [and] the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue." *Koshy*, 2010 ME 44, ¶ 47, 995 A.2d 651 (quoting § 6). Here, New York has a strong interest in protecting its citizens from defamation, invasion of privacy, infliction of emotional distress, and other torts, regardless of where the tortfeasor's activity took place. At the same time, New York's anti-SLAPP law manifests an interest in ensuring the free flow of information and "provid[ing] the utmost protection for the free exercise or speech, petition, and association[al] rights" from vexatious litigation. *Palin v. New York Times Co.*, 510 F. Supp. 3d 21, 27 (S.D.N.Y. 2020) (quotation omitted). Maine also has enacted an anti-SLAPP law to further *its* interest in protecting citizens from "meritless lawsuits brought with the intention of chilling or deterring the free exercise of the defendant's First Amendment right." *Schelling v. Lindell*, 2008 ME 59, ¶ 6, 942 A.2d 1226. Of these underlying policy concerns, it is New York's interest in protecting its citizens from reputational, emotional, and potentially physical harms that is the weightiest. Cheng states that the allegedly defamatory statements have put her in fear for her physical safety, the safeguarding of which is the paramount duty of the sovereign. For this reason, "the majority of courts confronted with this choice of law question have found that the plaintiff's domicile should control." *Mzamane*, 693 F. Supp. 2d at 471.

For the same reasons, Cheng's claims for negligent and intentional infliction of emotional distress are also governed by New York law. In cases for personal injury, Maine courts apply the "law of the state where the injury occurred" unless "some other state has a more significant relationship . . . to the occurrence and the parties. *Koshy*, 2010 ME 44,

¶ 22, 995 A.2d 651 (quoting Restatement § 146). Even where the allegedly tortious conduct and the injury occur in different states, "the local law of the state of injury will usually be applied" so as not to undermine that state's interest in enforcing its laws and protecting its citizens. Restatement § 146, cmt. e. Here, Cheng's emotional distress occurs principally in New York, where she resides, which is also the state with the strongest interest in this suit. Accordingly, I look to New York law to adjudicate Cheng's claims.

**B. Application of New York Law**

***1. Invasion of privacy and infliction of emotional distress***

Defendants argue New York law does not recognize claims for false light invasion of privacy and does not permit independent emotional distress claims based on libel or slander scenarios. Mot. 43-44. Defendants are correct. Plaintiff cannot state a claim for false light invasion of privacy, because New York does not recognize such a cause of action. *See Howell v. New York Post Co.*, 612 N.E.2d 699, 703 (N.Y. 1993). Nor does Plaintiff state a claim for negligent or intentional infliction of emotional distress, because allegedly "defamatory statements generally cannot" support emotional distress claims under New York law. *Restis v. Am. Coal. Against Nuclear Iran, Inc.*, 53 F. Supp. 3d 705, 729 (S.D.N.Y. 2014). The making of false statements is "not sufficiently outrageous to state a cause of action" for infliction of emotional distress. *La Duke v. Lyons*, 250 A.D.2d 969, 973, 673 N.Y.S.2d 240, 244 (1998). Furthermore, "a cause of action alleging . . . infliction of emotional distress should be dismissed 'where the conduct complained of falls well within the ambit of other traditional tort liability,'" including alleged conduct that "falls squarely within the scope of [a] defamation claim." *Demas v. Levitsky*, 291 A.D.2d

653, 660, 738 N.Y.S.2d 402, 409 (2002) (quoting *Fischer v. Maloney*, 373 N.E.2d 1215, 1217 (N.Y. 1978)).

Plaintiffs' claims for relief all arise out of a defamation-based factual scenario. Therefore, it is appropriate to dismiss them for this reason alone, separate, and apart from the application of New York's anti-SLAPP defamation law, to which I turn now.

***2. New York anti-SLAPP law***

New York's anti-SLAPP law is "construed broadly," such that "any communication in a . . . public forum" regarding the public interest, including "any subject other than a purely private matter," N.Y. Civ. Rights Law § 76-a, is presumptively protected from suit. Under this statutory[3] scheme, "an action involving public petition and participation" will be dismissed unless the plaintiff demonstrates by clear and convincing evidence that the cause of action has a substantial (*i.e.*, more than reasonable) basis in law, *Sackler v. Am. Broad. Cos*., *Inc*., 144 N.Y.S.3d 529, 534 (Sup. Ct. 2021), or "is supported by a substantial argument for an extension, modification or reversal of existing law." N.Y. C.P.L.R. 3211(g)(1).

The *Beacon* is a public forum for the purpose of New York's anti-SLAPP law, which state and federal courts alike have held extends to statements published in newspapers. *See Palin*, 510 F. Supp. 3d at 29; *Reus*, 148 N.Y.S.3d at 669. Additionally, the topics discussed in the Article—Cheng's presence at the Capitol riot and both Plaintiffs'

[3] Much of what is said hereafter concerning New York free speech law might also be said concerning the First Amendment of the United States Constitution. While the Supreme Court's free speech precedent provide context for the development of the New York law discussed hereafter, those cases do not drive state law, speech-protective proceedings that effectively curtail the reach of state tort law.

history of advocating purportedly right-wing and conspiratorial ideas—are matters of public interest. The Capitol riot was an important national event, and Cheng's decision to speak to a political gathering after having attended the riot made her attendance a part of the public discourse. Indeed, Cheng's attendance at the riot ceased to be a "purely private" matter, if it ever was private in the first place, when she chose to speak publicly about it during a guest appearance on a broadcast. *See* Compl. Ex. B (ECF No. 1-2).

Because the New York anti-SLAPP law applies here rather than the standard Rule 12(b)(6) framework set out in the Federal Rules of Civil Procedure, I may look beyond the pleadings to consider "supporting and opposing affidavits stating the facts upon which the action or defense is based" when adjudicating this motion. N.Y. C.P.L.R. 3211. Thus, I will consider not only Plaintiffs' Complaint and exhibits attached thereto, but also the *Epoch Times* articles identified in and attached to Defendant Neumann's affidavit. *See* Neumann Decl. ¶¶ 26–33 (ECF No. 12-1); Def's Mot. Ex. 2 (ECF No. 12-2). Although looking beyond the four corners of Plaintiffs' pleadings ordinarily would call for the conversion of this motion to dismiss into a motion for summary judgment, *see* Fed. R. Civ. P. 12(d), *Erie* demands that I honor this procedural component of New York's statutory scheme. *See supra* Section A.1. In any event, the articles in question would be subject to my consideration even under federal procedures. A court ruling on a motion to dismiss under Rule 12(b)(6) may "augment" the pleadings with materials "susceptible to judicial notice." *Cruz-Arce v. Mgmt. Admin. Servs. Corp.*, 19 F.4th 538, 543 (1st Cir. 2021). And here, I find it proper to take judicial notice of the *Epoch Times* articles attached to Defendants' motion to dismiss, though only for the fact of their publication and content,

not for the supposed truth of their content. *See Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008). On the other hand, though I note the existence of several other news articles submitted or cited by the parties and amicus curiae, because it would be inappropriate for me to take judicial notice of the factual assertions found in those other articles, and because the articles have been offered for no other purpose, I have disregarded them entirely. *Greenspan v. Random House, Inc.*, No. 12-1594, 2012 WL 5188792, at *1 (1st Cir. Oct. 16, 2012). With the record outlined, I turn to the merits.

"Under New York law, a plaintiff must establish five elements to recover in libel: 1) a written defamatory statement of fact concerning the plaintiff; 2) publication to a third party; 3) fault (either negligence or actual malice depending on the status of the libeled party); 4) falsity of the defamatory statement; and 5) special damages or per se actionability (defamatory on its face)." *Celle v. Filipino Rep. Enters. Inc.*, 209 F.3d 163, 176 (2d Cir. 2000). Defendants' Motion implicates the first, third, and fourth elements of this standard because they contend that certain statements were opinion rather than fact (element 1), other statements were substantially true (element 4), and no statement was published based on actual malice (element 3).

I start with element 3, negligence versus actual malice. Quite clearly, the *Epoch Times* is a public facing media enterprise and, therefore, a "public figure" that must prove actual malice to sustain its libel action. *Park v. Capital Cities Communications*, *Inc.*, 181 A.D.2d 192, 197, 585 N.Y.S.2d 902 (1992) ("The essential element underlying the category of public figures is that the publicized [entity] has taken an affirmative step to attract public attention."). Similarly, although Dana Cheng identifies herself as a private

individual, she has taken affirmative steps to attract public attention on the very topics that inform Defendants' reporting about her. Because that reporting focuses on Cheng's media and public outreach activities, it is appropriate to require Cheng to prove actual malice when it comes to her own libel action. *See id.* (private physician held to proof of actual malice where alleged libel addressed physician's active pursuit of media attention to garner publicity for his practice). Cheng may not be a public figure for all purposes, but she certainly is for the limited purpose of the Article that gives rise to this libel action.

Because both Plaintiffs are public figures for purposes of this action, they must present facts that justify a finding of fault amounting to actual malice on the part of Defendants. "Actual malice 'must be supported by clear and convincing proof' that the publisher of the statements 'had a subjective awareness of either falsity or probable falsity of the defamatory statement or acted with reckless disregard of ... its truth or falsity.'" *Electra v. 59 Murray Enterprises*, *Inc*., 987 F.3d 233, 259 (2d Cir.), *cert. denied*, 142 S. Ct. 563 (2021) (quoting *Celle*, 209 F.3d at 182-83). Plaintiffs do not clear this hurdle. The core of Plaintiffs' argument consists of flat assertions that the "Article itself shows calculated falsehoods," Def.'s Opp'n 18 (ECF No. 35), and that "Defendants demonstrated a reckless attraction" to defaming Plaintiffs, Def.'s Opp'n 21. But mere recitations of the actual malice standard cannot demonstrate a substantial basis in law for Plaintiffs' suit. *Cf. Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (discussing threshold for surviving motion to dismiss for failure to state a claim). A review of Plaintiffs' Complaint, the attached radio interview transcript, and supplemental information provided by Plaintiffs fails to substantiate these conclusory allegations by revealing cause to infer that Defendants

knew or should have known that the Article contained falsehoods. In particular, Defendants' alleged failure to fact check the Article's claims does not support an inference of malice. Under New York law, alleged shoddy research cannot support an inference of actual malice. *Sackler*, 144 N.Y.S.3d at 534 (defendant's "insufficient research" did not support a finding of actual malice); *see also Reus*, 148 N.Y.S.3d at 670 (defendant's failure to interview plaintiff prior to publishing critical article did not support a finding of actual malice).

In addition to falling short of the high bar set by the actual malice standard, with the exception of one otherwise non-actionable statement concerning Robert Mercer,[4] Plaintiffs cannot demonstrate a substantial basis to infer that any of the allegedly libelous statements are both statements of fact (element 1) and false (element 4). Some of the challenged statements are not actionable because they are "substantially true." *Franklin v. Daily Holdings*, *Inc*., 135 A.D.3d 87, 94, 21 N.Y.S.3d 6, 12 (2015). In this category are Defendants descriptions of Cheng's January 6 presence at the Capitol and her statements during the Kim Monson Show. Defendants accurately reported that Cheng was present at the January 6 Capitol riot, that she did not enter the Capitol building, and that she subsequently attributed the riot to anti-fascist activists. The truth of Defendants' statements is evident in the record before me. In the radio interview transcript Plaintiffs attached to the Complaint, Cheng admitted to having been at the Capitol when rioters broke into the

[4] The Article's assertion that Robert Mercer helped to fund the Epoch Times is the sort of "minor inaccurac[y]" whose absence would not alter the Article's overall message concerning Dana Cheng and the *Epoch Times* and so cannot support their claim for defamation. *Love v. William Morrow & Co*., 193 A.D.2d 586, 587, 597 N.Y.S.2d 424, 426 (1993). In any event, the fact that Defendants subsequently corrected the Article to remove this minor inaccuracy belies the argument that they knew of or recklessly disregarded its falsity at the time of publication.

building, and she claimed there was evidence that anti-fascists were responsible for the violence. *See* Compl. Ex. B. Plaintiffs may dispute the Defendants' characterization of these facts in the Article, or the negative inference Plaintiffs may justifiably believe Defendants wished to elicit from their readership, but they cannot dispute the baseline veracity of the reporting.

As for Defendants' characterizations of Cheng as a far-right conspiracy theorist and the *Epoch Times*' as a promoter of right-wing ideas, assuming that these aspersions falsely malign Plaintiffs' media activity, the statements nevertheless were not statements of "fact" but rather commentary about what the facts in the article suggested to Defendants and might suggest to an objective outsider. "[I]t is well settled in New York 'that an alleged libel is not actionable if the published statement could have produced no worse an effect on the mind of a reader than the truth pertinent to the allegation.'" *Franklin*, 21 N.Y.S.3d at 12 (quoting *Guccione v. Hustler Mag., Inc.*, 800 F.2d 298, 302 (2d Cir. 1986)).

I begin with Defendants' characterization of the *Epoch Time* as a promoter of certain ideas. As a matter of fact, the *Epoch Times* has published articles rebuffing the prevailing scientific position on vaccination and reporting on the QAnon theory that, perhaps without exactly endorsing of those viewpoints, work to encourage and develop the patronage of readers who share these heterodox perspectives. *See* Neumann Decl. ¶¶ 26–33 (ECF No. 12-1). Consequently, when Defendants reported in the Article that the *Epoch Times* "promoted anti-vaccine misinformation and . . . QAnon," they conveyed to the reader an interpretation of existing facts associated with the publication record of the *Epoch Times*, *i.e.*, that the *Epoch Times* has published articles appealing to patrons who dispute the

efficacy of vaccination programs and the legitimacy of the 2020 election, as well as articles unconcerned with the trustworthiness of purported national security leaks posted to anonymous online message boards. If *Epoch Times*' reporting in this vein is not literally "promotion," as Plaintiffs assert, then it can fairly be regarded as reporting that doles out an alternative narrative simply to feed market demand for the same. Such conduct can fairly be regarded as "promotion" in the mind of an objective outsider.

Similarly, to the extent that Plaintiffs argue for a more nuanced reading of the challenged statements—that ascribing to the *Epoch Times* an anti-vaccine or pro-QAnon worldview is not just a factual statement regarding the paper's contents, but an implicit characterization of the paper as irresponsible or disreputable—their claim fares no better. Indeed, it merely reinforces the point I have been making thus far. This kind of value-laden, journalistic perspective is not a statement of fact. Belief or disbelief in the mind of the reader about Defendants' subjective characterizations is a function of the reader's own political orientation, a phenomenon that is notoriously metaphysical and not neatly reduced by a jury verdict form to test the truth. *Covino v. Hagemann*, 627 N.Y.S.2d 894, 895 (Sup. Ct. 1995) ("Only false assertions of fact may be the subject of an action for defamation; an expression of opinion is not actionable as a defamation, no matter how offensive, vituperative, or unreasonable it may be, since it cannot be subjected to the test of truth or falsity." (citation omitted)); *Cf. Milkovich*, 497 U.S. at 19 ("[A] statement on matters of public concern must be provable as false before there can be liability under state defamation law ….").

This brings us to the Article's characterization of Cheng as a far-right conspiracy theorists and the *Epoch Times* as a right-wing media outlet. It is understandable that these pejoratives would be offensive to a journalist or media outlet seeking to project an air of objectivity. However, "rhetorical hyperbole" and even "vigorous epithets" are not actionable when the content of a publication, "as a whole," makes it "clear to the reasonable reader or listener that the accusation is merely a personal surmise built upon th[e] facts." *Gross v. New York Times Co*., 623 N.E.2d 1163, 1169 (N.Y. 1993) (quoting *Greenbelt Co-op. Pub. Ass'n v. Bresler*, 398 U.S. 6, 14 (1970)).[5] So it is here. The name calling, however offensive to Plaintiffs, was an expression lacking in "precise meaning" and clearly packaged to convey to the reader the author's judgment on the significance of the otherwise substantially true statements contained elsewhere in the Article. *Id. at* 1167. *See also id.* at 1168 ("[A] proffered hypotheses that is offered after a full recitation of the facts on which it is based is readily understood by the audience as conjecture."). Like it or not, news analysis is often delivered with plenty of English on the ball in service of an ideological agenda and market viability. Whether such practices contribute positively to delivering our species closer to the truth is a question for philosophers. It is not enough to support a defamation claim.

The *Epoch Times*' appeal to readers interested in QAnon as something more than a conspiracy theory, like its appeal to readers holding an anti-vaccine perspective, invites

---

[5] *See also*, *cf. Greenbelt Co-op. Pub. Ass'n v. Bresler*, 398 U.S. 6, 14 (1970) (concerning use of the word "blackmail" – explaining that as a matter of law the usage was no basis for the imposition of liability under state law, as "even the most careless reader must have perceived that the word was no more than rhetorical hyperbole, a vigorous epithet used by those who considered Bresler's negotiating position extremely unreasonable").

critical commentary by persons for whom these perspectives are offensive or outlandish. Whatever the proper political label is for readers of these persuasions, it has become a shorthand to describe them as falling on the right of the spectrum, somewhere outside the moderate or mainstream middle ground, if only to set them apart from the stereotypes brought to mind by the equally facile left-wing conspiracy theorist label. In this way, the right-wing label serves a communicative purpose for Defendants and their readers, even though it is at best a low-resolution caricature and may not hit the bullseye when it comes to describing the media objectives of the *Epoch Times* and Dana Cheng.

Whether epistemologically sound or not, media's usage of labels like right-wing and conspiracy theorist is a product of our times and our political culture. The meaning of these words is supplied by "the broader social context and surrounding circumstances," which "signal" to readers that what is being read is something other than a statement of fact. *Id.* at 1167. And because the *Epoch Times* has published media content having a tendency to excite or pander to so-called right-wing sentiment, Defendants' use of these labels to describe not only the *Epoch Times* itself, but also Dana Cheng, an *Epoch Times* founder and a media participant in her own right who characterizes mainstream American media as communist-influenced, falls under the protection of New York law governing the use of hyperbolic rhetoric and vigorous epithets concerning persons and topics of public interest.

In summary, Plaintiffs have failed to demonstrate that Defendants' Article is not presumptively protected from suit under New York Civil Rights Law § 76-a or that their libel claim "has a substantial basis in law or is supported by a substantial argument for an

extension, modification or reversal of existing law" under New York Civil Practice Law and Rule 3211(g).

## CONCLUSION

Defendants' Motion to Dismiss (ECF No. 12) is **GRANTED**.

**SO ORDERED.**

Dated this 3rd day of February, 2022.

/s/ Lance E. Walker
UNITED STATES DISTRICT JUDGE